In re Fall Line Tree Service, Inc. Galen Gentry appearing for appellant. Ethan Bernberg appearing for appellees. Gentry, do you wish to reserve some time? I do. I'd like to reserve five minutes, please. Okay, thank you. Good morning, Your Honors. Galen Gentry appearing for appellant, Fall Line Tree Service, Inc. I guess as a housekeeping matter, since the two appeals that are at issue here involve basically the same issues, just with slightly different burdens of proof, I'm just going to argue them together. Again, that would probably be the most efficient way. I agree. It's sort of six to one half dozen of the other in terms of the issues. Right, right. Okay, so diving in, the fundamental issue on appeal is this. Should appellant be required to continue incurring damages from appellees' fraud through further overpayment for assets purchased from appellees? Well, and let me just stop you right there. So he came up with an amount of damages, right? Correct. He made a specific finding of a specific number. Correct. And you've collected that number. Correct. So how are you continuing to incur damages? Well, we would continue to incur damages if we have to keep, or if appellant has to keep making payments to appellees on these promissory notes that were the integral part of the underlying fraudulent transactions. So you disagree with his factual finding as to the amount of damages? Do not disagree as to the factual finding on the amount of damages. We disagree as to how he dealt with the causes of action requesting disallowance of the proofs of claim. Well, let me just say, I don't think there's any dispute that the, what I'm going to call the business note and the proof of claim based on the business note should be gone. And that may be something that ministerial, we could even handle at this level because I'll ask your opposing Mr. Burbank. I don't think he disagrees. So that note's gone. Right. There's a small, there's a balance left. It's the full balance on the, what I'll call the inventory note, but that's only because you left it. And you've already recovered your damages. Had you offset, it would be substantially smaller. So we're really talking about end of the day, $100,000 and change, right? Approximately that. That's correct. So tell me the math that gets me to where you, that should go away too. Given his finding that the damages were in a specific amount. Right. And the way the damages were calculated, they were calculated based on the out-of-pocket loss rule, which is the way that damages are calculated for fraud under California law. And they were calculated that way because my client, appellant, Fall Line Tree Service, Inc., had already paid about $110,000 more than the fair market value of the assets that they acquired from appellees. So this is not a case of, you know, there's just like another, like a promissory note out there that we're trying to disallow. This is amounts that they had already overpaid. So we have that. Walk me through, because he didn't find, that suggests the damages should have been, you said you don't believe the damages number. This is the problem. Let me freely admit, this is not a crystal clear record in terms of what he did, but there are a few things that are lined out in red. And one is, damages are this. It's clear from his findings that he assumed that the numbers would remain outstanding for some amount, because he said you can offset it, right? Right. But I think we run into this problem where the doctrine of offset ends up with this kind of awkwardness when it's combined with the out-of-pocket loss rule. And we also have remaining purported outstanding indebtedness from the fraudulent transactions. So if my client, if the appellant had already overpaid, that is, they had already paid more than the fair market value of the assets, there's no... There's no finding that they'd already paid it as opposed to the face value of the notes. And then he added the consequential damages from the fact that they had to go to hard money lenders. But the finding... And he made that finding. He did make that finding, that they had already overpaid by $110,000. And that's because they had paid about $335,000 to appellees already. Did he say that they paid that or that that was the value of what they promised to pay? No, he did say that they paid that. And there was evidence for that on the record. It was established at trial. And it was undisputed by appellees. They did not argue against having already received that approximately $335,000 amount from appellant. The issue comes in... $335,000, you've got a couple of requests for admission that are conceded. One was that the inventory was overpaid. They conceded by $100,000, right? Correct. And then there was also a determination on the business note that there was a much smaller amount but they didn't get an appraisal. So that was a $270,000 note, but the appraisal, whatever, you were never suggesting. That they overpaid on that note the full balance, correct? That wasn't in your request for admission. No, the request for admissions were submitted early in the case. And they don't necessarily cover the full scope of the damages that my client had suffered. But that's the basis for some of the awards, aren't they? For some of it, yeah. But the finding that the trial court made as to the value of the business was that it was worth $225,000. And that was based on the testimony by the business broker who had reviewed... Did you say he included the inventory in that? The business broker included the inventory in that appraisal, did she? She did. And that's in the testimony. That the business broker had provided appellees an opinion of value on the business that included inventory, and that that opinion was that it was worth $225,000. Is it necessary, where did he find that all the overpayment was the result of fraud? I think it's in his findings of fact and conclusions of law. I could try to direct you particularly to the... I'm having a problem with, again, what he clearly found, which is this set amount of damages. And that set amount of damages, there's two things that I think you're arguing that I'm having trouble with. That he clearly found that that $110,000 was additional, that they'd already paid everything, or they'd already overpaid that. I don't see that finding crisply made. And then the second problem is, I don't see... Well, let's start with that one. Where is that? Sure. At the bottom of page 24 of the findings of fact and conclusions of law, and that's Appellant's Appendix 975. The sentence reads, and Section 334 informs the analysis, informs the analysis and leads me to conclude that the difference in the actual value of the assets purchased and the amount already paid is $110,000. So you're saying that having said that, what he's saying is that you can offset his other statements, that this is the amount... ...valued at that amount, and that's what we have to... That's correct. That he valued the business assets at $225,000 in accordance with the business broker's testimony. And he found that $110,000 had already been paid, and he awarded that amount plus the $13,324 or so. And to have that result, don't we also have to conclude that he determined all the overpayments? Correct. That's 100% correct. Why did you say that? What's that? That all of the overpayment was the result of fraud? Well, I think the fact that his sentence refers to Section 334... I'm sorry, 3343... That's the civil code, right? Right. You're backing into it that way. Right. California Civil Code Section 3343 informs the analysis, informs the analysis and leads Judge Klein to conclude that the difference in the actual value of the assets purchased and the amount already paid is $110,000. So he's not differentiating within that amount whether $70,000 of it was incurred for some other reason or if it was based on the actual value of the assets. I think he found that the value of the assets was $225,000. They had already paid $335,000. Therefore, their out-of-pocket losses already incurred were $110,000 and then plus the approximately $13,000. So we get to a point where the fraud damages make my client whole. They make appellant whole, basically. They bring them back to kind of square one in terms of having received back what they had overpaid for those assets. And that leaves us with the additional problem of these remaining promissory notes where appellees are still trying to collect money for those assets where they had induced appellant to overpay for them. And the only logical conclusion is that those promissory notes need to be disallowed in their entirety as to any remaining amounts because there is no logical reason whether it's due to, you know, appellee's unclean hands or due to a failure of consideration or due to kind of a modified application of the set-off rule. There is no logical basis to allow appellees to continue collecting money when the trial judge already ruled that appellant had overpaid for those assets. I would. Thank you. All right. All right. To Mr. Bergbroke. Good morning, your honors. May it please the court. My name is Ethan Bergbroke, and I represent the three appellees listed in this matter. Our brief described what our view of Judge Klein's ruling was and why it was correct. He allowed the inventory proof of claim in the amount that it was stated, the $246,000 number. I think Judge Taylor's questions are directly on point with regards to some of the evidentiary issues that the appellants have. And I won't go over all of my brief, but I want to hit a few salient points and also address a few evidentiary issues and areas that were admitted to the lower court of what Judge Klein relied on to reach his conclusion. And I think ultimately, based on what I've heard from appellants' argument today, there's two separate parts of this sale transaction. And I think that's where maybe the disconnect is, or at least in our view, that's definitely where it is. Judge Klein sees the inventory part of the sale transaction, which went through escrow. It was helped by the broker Katrina Lofton, and the parties went item by item with the inventory to count it before closing. Now, then there's the second part, which is the goodwill, the fixtures, the furniture, point of sale system, all the other things you need to do to run a ski shop. And these two parts have very different analysis. The business broker helps with the inventory side, pushes it through escrow, and receives a commission for that, and the parties agree that $396,849 of inventory was sold that day. And then the business broker argues that the purchase price should only be $225,000. Well, Judge Klein weighs that evidence. And again, the business broker says  she does not have qualifications as an expert, she's essentially a person with personal knowledge providing lay testimony. Judge Klein says, okay, I have evidence of $335,000 of payments. I see that this is worth $225,000 for the goodwill, the fixtures, and the fortunes, and I'm going to do math here, $110,000 of damages. As your honors have pointed out, there's another $13,000 of hard lender damages, so we get to that amount of $123,000 and change. And then Judge Klein says, I'm going to offset that from the allowed proof of claim number four for the inventory. Because all of the evidence, both by testimony and in documents, states that that inventory was sold on that day. And therefore, it's allowed, but it's subject to offset. And how do we know that? Well, first off, Miss Nichols, the Fall Lions principal, testifies that she always knew there was two separate transactions. There was the goodwill, the fixtures, and the furniture, and then there was the inventory that went through escrow. She testifies that she made an item-by-item count of all the inventory. She put it on a spreadsheet in her computer, and then the parties agreed that it was worth $396,849. They paid $10,000 at closing, and that led to the $386,000 promissory note that supports the inventory proof of claim. But two more things happen right after that closing. First, Fall Lions sells that inventory and grosses over $1 million during 2018. The closing's in May of 2018. By the end of that year, they've grossed over $1 million with the inventory and the other items that they purchased. And that's Appellate Appendix 418 as their tax return. Miss Nichols' testimony on Appellate Appendix 635 says that they made over $1 million, and in her view, that was $150,000 to $200,000 more than the appellees had ever made when they operated that business. Can I ask you a stupid question? With respect solely to the inventory that was purchased on the day of the purchase, not with respect to anything that might have been purchased afterward, was that reckoning actually done? Tax return wouldn't tell you that. When you say reckoning, are you saying reconciliation of some nature? Well, no, there's a certain amount that's sold on a closing day, right? I forget what day of the... But are you assuming that they didn't buy anything else in the meantime? So whatever they generated had to do only with that inventory? That doesn't sound right to me. Right, no great question, Your Honor. The tax return never would have told you that, right? Well, I'm not sure about the attachment, but... I'm not arguing the findings, but that just doesn't sound right. Correct, no, I understand the concept. And what had happened is... Maybe it doesn't matter. I would like to answer the question, Your Honor, because I think it does provide some color. I'm sorry. I didn't know if there was another question from the panel. Go ahead and answer his question. It's an important question. It's an important fact that we find here in the transcript. The inventory escrow, again, the separate portion of that sale transaction, Ms. Katrina Lawthorne helps with it and tells both parties—this is her testimony— you need to find a purchase price so I can open escrow. So both parties say, let's call it $500,000. And they execute an original purchase agreement, which is in the appendix. I believe it's 363. And that states that the purchase price for the inventory is about $500,000. It's a guess that the parties think might happen because they're going to reconcile it before actual closing. Paragraph 4 of that original purchase agreement even says it could be anywhere from $250,000 to $500,000. So then time moves on, and on April 30, 2018, right before that May closing, they do the item-by-item inventory, they do the reconciliation of what was purchased, and then they sign what is known as the joint inventory statement by both parties, stating the amount of the inventory was $396,849. So I don't think after that, at least to my knowledge, Your Honor, the record and the attachments don't display what would happen after that except that Fall Line received all that inventory and then sold it. And that's from the gross receipt statement. My only point is they probably sold it and something else if you're talking about an end-of-the-year result. That's my only point. Oh, I apologize if I misunderstood. I would agree. If we're trying to back into $396,849 by saying, well, they sold it for $1.2 million, I think the $1.2 million might have resulted in something more than the inventory at closing. That's my only point. I agree. Your client's bound by the request for admission, though, where they agreed that the price was overstated by $100,000. Your Honor, I can't contest about Rule 36 and the deemed admissions. I do think, though, the record reflects that Judge Klein tried to take in the testimony, not rely on the request for admissions. I don't believe the record actually reflects him admitting the admissions after the motion, although I think it's inferred that he does rely upon in his finding the facts. But I do think Judge Klein was trying to take a fair take at it, realizing that it was a technical failure to respond on behalf of the FLEs and wanted to know what the evidence was. Let me back this up. This case was decided. The damages were awarded solely on the basis of fraud, correct? I believe it was also based on the amount of the purchase price. I think fraud was embedded in the problems. There's no doubt about that and in the finding. The causes of action which led to the damages there was a lot in this complaint. It wasn't based on breach of contract, right? Correct. It wasn't based on unfair business practices, right? I believe that was pled as a cause of action but withdrawn. Right. So the damages aren't based just on the disparity in the price. The damages are based on the disparity in price to the extent it was caused by fraud or misrepresentation or omission, whatever. Is that correct? I believe it's correct but I also think it's centered on the fact of Ms. Katrina Lofton's testimony of what she believed that other portion of the purchase price should have been and then what was actually paid. But there was allegations of fraud and I do believe Judge Klein found that there were some fraudulent actions that occurred during that time. But I don't think he said based on the fraud I'm finding $110,000 of damages. I think the calculation was based on what was paid versus what Ms. Lofton stated the purchase price was for that portion of the sale transaction. So I think it's important we talked about the original purchase agreement and about how they worked through the There's also a personal property escrow instructions that state the exact amount of that inventory, the $396,843. Ms. Nickel's testimony, the Apo Lee's testimony, and Ms. Lofton's testimony all confirmed and Judge Klein understood that they had these two separate transactions and the escrow only concerned the inventory. There was no question about it. But the biggest problem that Judge Klein had was what they referred to as the side deal, the $270,000 promissory note. And as Judge Taylor mentioned, we agree, that was disallowed. Proof of Claim 5 is disallowed but it's separate from the inventory. And Judge Klein saw that they received that inventory, they sold that inventory, they agreed to pay for it, and in fact for 20 months after they signed that closing they made monthly payments. That's how we get to that $246,000 Proof of Claim that was filed timely and is presumed allowed and evidence under Rule 3001. None of those dollar amounts were ever contested at the trial court because they know they sold that much inventory, received it, and then they paid monthly as they needed to because this was a seller carry transaction. I think what's also key here is that joint inventory statement and that's Appellee Appendix 001 that clearly states both parties counted the inventory. I think Judge Klein had the right to and did weigh that evidence. He weighed the evidence that he received from the broker and decided here's how he's going to fashion a remedy. Now... ...
judges: Taylor, Lafferty, and Brand